# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 93-14029-CR-COHN/LYNCH

UNITED STATES OF AMERICA,

      **Plaintiff,**

v.

JOHN N. VERPORTER,

      **Defendant.**

_____/



FILED by _____ D.C.

APR 2 1 2008

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - FT. PIERCE

## REPORT AND RECOMMENDATION ON FINAL EVIDENTIARY HEARING
## IN REGARDS TO PETITION ALLEGING VIOLATIONS OF SUPERVISED RELEASE

**THIS CAUSE** having come on to be heard upon the Superseding Petition For Violations of Supervised Release dated December 7, 2007, and this Court having conducted an evidentiary hearing on April 2, 2008 and concluding that evidentiary hearing on April 16, 2008, and this Court having received evidence, testimony, and arguments of counsel, hereby recommends to the District Court as follows:

1.    The Superseding Petition alleges three violations of supervised release:

    **Violation Number 1**    **Violation of Mandatory Condition**, by failing to refrain from violation of the law. On or about September 14, 2007, in Broward County, Florida, the defendant did possess cocaine, contrary to Florida Statute 893.13.

    **Violation Number 2**    **Violation of Standard Condition**, by associating with a person engaged in criminal activity. On or about September 14, 2007, the defendant was arrested with Maria F. Dibartolo, w/f, dob: 12/13/79, a subject identified by the Broward County Sheriff's Office as committing the offenses possession of cocaine and fleeing or attempting to elude a police officer.

**Violation Number 3**      **Violation of Mandatory Condition**, by unlawfully possessing or using a controlled substance. On November 5, 2007, the defendant submitted a urine specimen that tested positive for the presence of marijuana in our local laboratory and was subsequently confirmed positive by Kroll Laboratory Specialist, Inc.

2.      The first witness called by the government was Frank Smith, the Defendant's United States Probation Officer. Mr. Smith began supervising the Defendant in January 2007 after a modification of the Defendant's sentence. The Defendant had a prior violation concerning a driving while under the influence charge in St. Lucie County, Florida. The modification to his sentence directed him to complete the State DUI Program, which apparently the Defendant has completed.

3.      After his arrest in respect to the purported criminal activity which took place in Broward County, Florida on or about September 14, 2007, the Defendant contacted Mr. Smith and stated that he had been at the Hard Rock Casino in Broward County with a friend, Maria DiBartolo. The Defendant denied possessing or knowing about any cocaine that was supposedly in the vehicle which resulted in his arrest and the arrest of Maria DiBartolo.

4.      Mr. Smith stated that there is a standard condition of supervised release in respect to the Defendant's sentence which requires him not be around or use any controlled substance or to be around persons using or engaging in any criminal activity such as possessing or utilizing controlled substances.

5.      Mr. Smith also testified that the Defendant tested positive for the presence of marijuana based upon a urine specimen provided by the Defendant on November 5, 2007. Counsel for the government and counsel for the Defendant stipulated to the chain

2

of custody in respect to the urine specimen and the laboratory analysis which was entered into evidence as Government's Exhibit 1. That report verifies that the Defendant's urine specimen submitted on the date in question tested positive for the presence of cannabinoids/marijuana. Mr. Smith stated that the Defendant denied using marijuana. During his own testimony later in the proceedings, the Defendant's explanation was that he was at an outdoor concert at an amphitheater in Palm Beach County, Florida, where the band "Rascal Flatts" was playing. The Defendant submits that there was a strong odor of marijuana in the tightly packed crowd and that the positive test results finding marijuana in his urine specimen had to have come from that second-hand marijuana smoke. However, the Defendant has not submitted any evidence, expert or otherwise, which would substantiate this claim that second-hand marijuana smoke can produce the level of marijuana detected in the Defendant's urine specimen.

6.      On cross-examination, Mr. Smith stated that since his arrest on September 14, 2007, the Defendant has been tested twice a week and has never tested positive for cocaine. The only other positive test for any controlled substance was the November 5, 2007 test which this Court has referred to above relating to the Defendant's marijuana use.

7.      Mr. Smith also testified on cross-examination that during his supervision of the Defendant, the Defendant has discussed having problems assimilating into society. The Defendant served a sentence in the Federal Bureau of Prisons of almost fifteen years. With the exception of the DUI referred to above and the Defendant's positive urine sample submitted on November 5, 2007, the Defendant has responded well according to Mr. Smith.

8.     The next witness called by the government was United States Probation Officer Richard Samson. He is the officer who collected the Defendant's urine specimen on November 5, 2007. Counsel for the Defendant stipulated on the record that the chain of custody regarding the Defendant's urine specimen is not being challenged. Further, as referenced above, the Defendant has stipulated to the laboratory analysis, Government's Exhibit 1, which reflects the presence of marijuana in that urine specimen.

9.     The next witness to testify was Sergeant Chalfant of the Seminole Police Department. Previous to this position, Sergeant Chalfant worked for approximately eleven years for the Florida Department of Corrections in Martin County. It was later submitted during his testimony and that of the Defendant at the evidentiary hearings in this case, that Sergeant Chalfant did, in fact, work at the Martin County Correctional Institute for the Florida Department of Corrections while the Defendant was serving a state sentence there. This Court will go into that in further detail later in this Report and Recommendation.

10.     On September 14, 2007, Sergeant Chalfant was on duty at the Hard Rock Casino. He was working undercover in plain clothes for the Narcotics Division. He was working in the parking garage and was sitting in a vehicle. While sitting in his vehicle, Sergeant Chalfant saw a male and female coming out of the elevator in the parking garage. He testified that these two individuals were "acting nervous." He further testified that the male subject, later identified as this Defendant, kept his eyes on Sergeant Chalfant.

11.     Sergeant Chalfant then sat in his car and watched the Defendant and the individual later identified as Maria DiBartolo go to their vehicle. The Defendant got into the passenger's side and DiBartolo got into the driver's side of the Volkswagen Jetta.

4

Sergeant Chalfant heard DiBartolo start the car and then she and the Defendant both sat in the vehicle for approximately ten minutes or more. Sergeant Chalfant called this in to the other officers and advised them that he was approaching a vehicle. He testified that he approached the vehicle from the back passenger's side with a flashlight. He shined the flashlight into the passenger window and testified that he could see the Defendant holding a compact disc case and a credit card, cutting a pile of white powder with the credit card. Sergeant Chalfant testified that this appeared to him to be cocaine. He has observed powder cocaine before and arrested persons with powder cocaine.

12.    Sergeant Chalfant stated that he observed the Defendant using a credit card to break the powder cocaine into lines. It was then that the Defendant purportedly looked up and noticed the flashlight. DiBartolo was simply sitting there watching the Defendant at the time.

13.    Sergeant Chalfant testified that the Defendant then turned to DiBartolo and told her to drive. DiBartolo put the car in reverse. Sergeant Chalfant stated that he had his badge pulled out from around his neck, held it and was yelling at the occupants of the vehicle that he was a police officer. Sergeant Chalfant testified that he told DiBartolo to stop the vehicle. She did not and continued to back out and drive away. Sergeant Chalfant then called the tag number and description of the vehicle to other officers who were at the exit of the parking garage. Sergeant Chalfant also testified that he could hear the Defendant say from inside the vehicle that "he's not a police officer, just drive."

14.    Sergeant Chalfant then got in his vehicle and pursued the Volkswagen down to the garage exit. Other officers had already stopped the vehicle by the time he got there. Sergeant Chalfant then told Officer Negrinelli that the Defendant was the one with the

5

cocaine. Sergeant Chalfant did not conduct a search, Officer Negrinelli did. Sergeant Chalfant testified that it was his understanding that there were "little clumps of cocaine" on the floorboard area where the Defendant had been sitting on the passenger's side. Additionally, Sergeant Chalfant understood that there was a baggie with cocaine residue and the CD case with cocaine residue seized from the passenger's side of the vehicle.

15. It was at this point in the evidentiary hearing on April 2, 2008 that counsel for the Defendant objected to certain testimony indicating that there was information not provided to the Defendant in pre-hearing discovery. Therefore, this Court told the parties to get together, exchange any discovery which may have been overlooked, and that the Court would conduct the conclusion of the evidentiary hearing on April 16, 2008.

16. On April 16, 2008, this Court reconvened the conclusion of this evidentiary hearing with Sergeant Chalfant back on the witness stand. Sergeant Chalfant testified that by the time he got to the parking garage exit, the other officers were getting the Defendant out of the passenger's side of the vehicle and the female from the driver's side of the vehicle. This differs from what the Defendant and DiBartolo testified to at this hearing. They both testified that they immediately and voluntarily got out of the vehicle on their respective sides when they saw the unmarked vehicle with red and blue lights flashing at the parking garage exit.

17. Both the Defendant and DiBartolo were cuffed and separated by the officers. DiBartolo was taken to the front of the vehicle and the Defendant to the rear. This is also different from what DiBartolo and the Defendant testified to at this hearing. They both testified that they voluntarily got out of the vehicle and walked back to the rear of their vehicle at the direction of the officers.

6

18.     Sergeant Chalfant testified that the search of the vehicle was conducted by Officer Negrinelli.  Sergeant Chalfant saw a small baggie and the CD case with cocaine residue on it.  These were on the passenger's side of the vehicle.  Government's Exhibit 2 entered into evidence at this hearing is the CD case which was identified by Sergeant Chalfant.  Government's Exhibit 3 admitted into evidence at this hearing is the plastic baggie which the government submits contained the cocaine.  Sergeant Chalfant testified that the baggie, Government's Exhibit 3, was seized from between the front passenger's seat and the passenger door.  Both Government's Exhibit 2 and Government's Exhibit 3 tested positive for the presence of cocaine.  Counsel for the Defendant stipulated to the chain of evidence, laboratory analysis and findings in regard to both of these items of evidence.  Government's Exhibit 6 admitted into evidence at this hearing is the lab report reflecting the analysis which was stipulated to by the government and the Defendant. This exhibit reflects that cocaine was present on both Government's Exhibits 2 and 3.

19.     Sergeant Chalfant testified that both the Defendant and the female driver, DiBartolo, were arrested and charged with the narcotics offense.  DiBartolo was also charged with fleeing and eluding.

20.     On cross-examination, Sergeant Chalfant stated that he did work at the Florida Department of Corrections, Martin County Correctional Institute, at the same time that the Defendant was an inmate there on state charges.  However, Sergeant Chalfant stated that he did not recognize the Defendant from that contact until Sergeant Chalfant checked the Defendant's prior record after his arrest in this case.  Sergeant Chalfant testified that the Defendant has an unusual last name so he was able to recall that he was

7

at the Martin County Correctional Institute at the same time when the Defendant was an inmate there.

21. Sergeant Chalfant stated that the Defendant continually looked at him after initially getting off the elevator with DiBartolo. Further, Sergeant Chalfant stated that even though there was some tinting on the windows of the car and the windows were in a closed position, he could see into the window of the car with the assistance of his flashlight. Also, he testified that the parking garage is a well-lit area.

22. Counsel for the Defendant reviewed portions of the police reports in this case and contends that they indicate that Sergeant Chalfant did not specifically say that he waited ten minutes or more watching the Defendant and DiBartolo in their vehicle. Rather, the reports indicate that he observed them "over several minutes." This Court does not find that to be a serious inconsistency or drastic misstatement of fact based upon the totality of the evidence heard in this case. Counsel for the Defendant also referred to Sergeant Chalfant's deposition in DiBartolo's case taken on February 14, 2008, in which Sergeant Chalfant testified that he watched the DiBartolo vehicle with the Defendant inside for five to ten minutes. Again, this Court does not find that to be any glaring misstatement, lie or inconsistency with the other evidence in this case.

23. One of the police reports indicated that Sergeant Chalfant walked up to the driver's side window. However, Sergeant Chalfant testified at this hearing that if the report states so, that it was incorrect. He specifically walked up to the passenger's side of the vehicle. This Court notes that the testimony of DiBartolo and the Defendant later at this hearing both confirm that Sergeant Chalfant approached the vehicle from the rear passenger's side and used his flashlight to illuminate the interior of their vehicle.

8

Therefore, this Court does not find that to be a deliberate misstatement of fact nor inconsistency. At most, it is an error in transcription or recollection.

24.    Sergeant Chalfant testified that to his knowledge no credit card nor other type of card was ever seized from the DiBartolo vehicle during the search. There is no such credit card, driver's license, or other similar card in evidence. There is nothing to indicate that there was any such card on the Defendant's person which was seized from him at the time of his arrest or at the time that he was booked into the Broward County Jail. He also did not know if any of the scrapings from the floorboard area of the passenger's side of the vehicle were taken. He testified that was up to Officer Negrinelli who was conducting the search.

25.    Officer Negrinelli of the Seminole Police Department next testified. He was also on plainclothes duty on the evening in question. It is noted that this incident took place at night. The testimony of the Defendant was that he and DiBartolo were leaving the area at approximately 9:45 p.m. when all of this took place.

26.    Officer Negrinelli testified that Sergeant Chalfant radioed to him that a Volkswagen Jetta was coming out of the parking garage and had fled from him. There is only one exit to the parking garage so Officer Negrinelli positioned himself there to stop the vehicle. He turned on his emergency lights on his unmarked car and the DiBartolo vehicle stopped as it exited the parking garage. DiBartolo was driving the vehicle and the Defendant, identified in court by Officer Negrinelli, was the passenger.

27.    Officer Negrinelli testified that he opened the passenger door and saw the Defendant with the CD case, Government's Exhibit 2, in his lap and that the Defendant was brushing a white powder off onto the floor on the passenger's side. There were no moves

9

by DiBartolo at that time. This contradicts what DiBartolo and the Defendant testified to at this hearing. They testified that they immediately got out of their vehicle before the officers even approached them.

28.    Officer Negrinelli testified that he got the Defendant out, cuffed him and brought him to the rear of the vehicle. It was there that he patted the Defendant down. He then waited for a marked unit to arrive.

29.    The CD case was on the passenger floorboard with trace amounts of white powder on it. The baggie, Government's Exhibit 3 in evidence, was found between the front passenger's seat and the front passenger door where the Defendant was sitting. These items were taken into evidence and submitted to the Broward County Crime Lab.

30.    Government's Exhibit 4 in evidence is the property receipt for the compact disc which is in evidence as Government's Exhibit 2. Government's Exhibit 5 in evidence is the property receipt for the baggie with cocaine residue, which is in evidence as Government's Exhibit 3. Government's Exhibit 6 in evidence is the lab report conducted in respect to the CD case and plastic baggie. The lab report reflects that the plastic baggie contained less than .1 gram net weight of cocaine and that the CD case had cocaine residue. As stated previously, the Defendant stipulated to the results and did not object to the lab analysis and its findings.

31.    Officer Negrinelli testified that he used a small piece of paper to try to put some scrapings from the floorboard into the plastic baggie, Government's Exhibit 3. He did a field test on the residue on the CD case and the baggie and they both tested positive for the presence of cocaine. He then identified the CD case as Government's Exhibit 2 in evidence and the baggie as Government's Exhibit 3 in evidence.

10

32. Officer Negrinelli testified that he never saw DiBartolo on the passenger's side of the vehicle nor in possession of the CD case or any of the cocaine. He also testified that when Sergeant Chalfant arrived on the scene that Sergeant Chalfant had his badge out hanging from a chain around his neck.

33. Officer Negrinelli testified that he typed up the reports in this case based upon what Sergeant Chalfant told him happened in the parking garage before the vehicle was stopped at the exit. He recalls Sergeant Chalfant telling him that he observed the DiBartolo vehicle for several minutes with DiBartolo and the Defendant inside. Sergeant Chalfant told Officer Negrinelli that he then approached from the driver's side and saw the Defendant pouring white powder on the CD case.

34. On cross-examination, Officer Negrinelli reiterated that he was the one who opened the passenger door where the Defendant was sitting in the vehicle and observed the Defendant holding the CD case in his lap, brushing a white powder off of it forward onto the floor. Officer Negrinelli then attempted to collect trace amounts from the floor with a small piece of paper and put them in the baggie which he seized from between the front passenger's seat and the front passenger door. No fingerprints were taken from the CD case nor from the baggie. Further, Officer Negrinelli could not recall if Sergeant Chalfant mentioned anything about a credit card. However, there does not appear to be any credit card seized by Officer Negrinelli during the search of the vehicle.

35. Thereupon the government rested its case.

36. The Defendant called as his first witness Maria DiBartolo. She testified that she knew the Defendant and identified him in court. They are not boyfriend and girlfriend. In fact, based upon the Defendant's later testimony, his girlfriend was seated in the rear

11

of the courtroom during this evidentiary hearing. DiBartolo met the Defendant while the Defendant was doing some work at DiBartolo's father's house. She testified that they had never been out before this one occasion. She just picked up the phone and called him on September 14, 2007 and asked if he wanted to go to the Hard Rock Casino with her. It was not considered a date. She picked him up and they arrived at the Hard Rock Casino at approximately 8:00 p.m. on September 14, 2007 and left at approximately 9:45 p.m. that same night.

37.    DiBartolo testified she was driving her own Volkswagen Jetta at the time of this incident. When she and the Defendant were leaving they took an elevator to the parking garage. They got off the elevator and walked to her vehicle. She got in the driver's side and the Defendant got into the passenger's side. She stated that they sat there listening to music and deciding where to go next. She testified that she put a CD in the vehicle player, but could not recall what CD she put in.

38.    She testified that within five to ten minutes, someone walked up to her car on the passenger's side. All she could see was a flashlight and a man standing on the passenger's side. She could not see his face nor hear anything that he was saying. She testified that she did not see a badge nor hear this individual, who was apparently Sergeant Chalfant, saying that he was a police officer. She became very nervous and the Defendant told her to "just go."

39.    DiBartolo then backed up and drove out of the parking garage. As she exited the ramp she saw the unmarked car with the blue and red lights flashing and stopped. She testified that she and the Defendant opened their own doors and both walked to the back of her car as they were directed by some female officer on the scene. After Sergeant

12

Chalfant arrived on the scene, DiBartolo purportedly told him that she did not know that he was "a cop." Both she and the Defendant were handcuffed.

40.    DiBartolo saw the police search her vehicle but could not see what was seized from the vehicle. She testified that there was no cocaine on a CD on the Defendant's lap. She testified that there was a CD in his lap, though, but there was no cocaine there. She never saw the Defendant with any cocaine nor any credit card cutting cocaine.

41.    It was at this time that DiBartolo testified it was her cocaine in the baggie on the floor of the passenger's side and that it was not between the front seat and the passenger door. She testified that it was a little bit under the seat. She could not recall if it was visible to the Defendant nor to anyone from outside the vehicle. She testified that she had used the cocaine earlier that day. She said she had used this CD, Government's Exhibit 2, earlier that day to snort the cocaine.

42.    DiBartolo testified that she was charged in State Court with the cocaine and those charges were dropped. The fleeing and eluding charge was reduced to a resisting arrest without violence misdemeanor to which she pled guilty. Defendant's Exhibit 1 reflects that DiBartolo's case was disposed of by entry of a plea to the misdemeanor on February 18, 2008 in Broward County.

43.    On cross-examination, DiBartolo stated that she knows she could still be charged with the cocaine possession. She testified that she bought it from some unknown man in Lake Worth who she does not know. Her attorney was present at the hearing and purportedly told her that she should not testify. She testified that she met with the

13

Defendant's attorney at the last hearing on April 2, 2008 which was held by this Court and told him what had happened.

44.    Insofar as the incident in question, she recalls Sergeant Chalfant coming up to the passenger's side window with his flashlight. She never heard anyone say that he was a police officer.

45.    DiBartolo testified that she does not use cocaine anymore. Prior to her arrest in this case, she used it "recreationally" for a year. She testified that she paid $20.00 for this baggie of powder cocaine, but was not sure how much was in it. She testified that she used a key to snort the cocaine "up her nose." She testified that she used the entire baggie and that she either used the key or the CD case to snort it. She testified that she averaged spending $20.00 to $40.00 per week on cocaine at that time.

46.    After his arrest, the Defendant called her and told her that he could go to prison for this offense since he was on federal supervised release. DiBartolo stated that the Defendant did not ask her to testify in this case, which is somewhat inconsistent with what the Defendant later testified to at this hearing. However, this Court will wait to address that issue when it reviews the Defendant's testimony. DiBartolo testified that she agreed to testify even before her case was, in fact, dismissed in Broward County State Court. She never called the police, told the police at scene, nor called the Defendant's probation officer to tell them that it was her cocaine. Counsel for the Defendant objected and stated that she had no affirmative obligation to do so. However, this Court believes that such an issue may go to her credibility. Further, DiBartolo testified that she never admitted before this date that the cocaine was hers except for telling her attorney.

14

47.    The next witness to testify was the Defendant, John Verporter. He lives in West Palm Beach, Florida, with his girlfriend. He was released from the Federal Bureau of Prisons on or about October 26, 2006 after serving a fourteen year, seven month sentence. He acknowledged the prior DUI and his modification of his sentence in respect to that arrest. Everything was handled internally and nothing was taken to court.

48.    The Defendant testified that he works for a Mr. Clark hanging photos and doing odd jobs. While he did not testify, the Defendant's employer was apparently in court according to the Defendant's testimony. He makes $20.00 an hour doing this work.

49.    On the day in question, September 14, 2007, the Defendant and DiBartolo were at the Hard Rock Casino. He had met DiBartolo while he was doing some work at her father's house. The Defendant did not consider this a date. DiBartolo simply called him up and asked if he "wanted to have fun." He estimated that they were at the Hard Rock Casino approximately one and one-half hours before they left.

50.    He believes the car was parked on the fourth floor. As they got off the elevator he did not see Sergeant Chalfant nor stare at him as Sergeant Chalfant testified. He and DiBartolo were simply looking around for the car.

51.    After arriving at the DiBartolo car, DiBartolo got in the driver's side and the Defendant got in the passenger's side. They sat there approximately five minutes when someone came up banging on the window with a flashlight. Nothing could be heard inside the vehicle because the radio was on. The Defendant did have a CD case in his hand, but no cocaine. Further, the Defendant testified that he did not see nor know of any cocaine in the vehicle.

15

52.    The Defendant testified that he told DiBartolo "you better go." He could not hear anything from the person outside and did not know that it was a police officer. As they were exiting the parking garage, DiBartolo stopped the car when they could see an unmarked police car with red and blue lights flashing.

53.    The Defendant testified that he and DiBartolo immediately got out of the car themselves without being asked to do so. They both then walked to the back of the car because they were told to do so by two female police officers at the scene. They were frisked right away. They were not cuffed until evidence was found in the vehicle some time later.

54.    The Defendant stated that he saw Officer Negrinelli searching the car, but the officers told the Defendant to turn around so he could not see exactly what was seized from the vehicle. Therefore, he did not see the CD case nor the baggie come out of the car.

55.    The Defendant denies that he had any cocaine on the CD case in the car. He stated that he never has tested positive for cocaine. Since his arrest, he gets tested every Monday and Friday by his U. S. Probation Officer by giving urine specimens.

56.    After this incident took place, he called DiBartolo and said that he was arrested on the cocaine charge. It was at that time that DiBartolo purportedly told the Defendant that the cocaine was hers. The Defendant stated that he never had a credit card, a driver's license or any such instrument to cut cocaine. He did have a driver's license and he believes it was in his wallet.

57.    In respect to the positive marijuana urinalysis, the Defendant states that he never tested positive before or since for any controlled substance. He claims to have

16

never used marijuana. He testified that maybe he tested positive because of "second-hand smoke" at the "Rascal Flatts" concert in Palm Beach County. On cross-examination it was pointed out that the concert was at an open air amphitheater and the Defendant was in the grassy area not under a cover. As was pointed out by counsel for the government, this was not an enclosed auditorium or other inside venue, but an outside amphitheater. The Defendant testified that the crowd was "tightly packed" around him and that there was marijuana smoke everywhere. This is the only explanation he could give for having tested positive for the presence of marijuana in his urine specimen submitted in November 2007. As stated previously by this Court, there is no other evidence, expert or otherwise, as to the effects of second-hand marijuana smoke on an individual and how it could be detected during a urinalysis as conducted in this case.

58.     The Defendant stated that he did not recognize Sergeant Chalfant until they were at the county jail. It was then that he recalled Sergeant Chalfant as being an officer at the Martin County Correctional Institute when the Defendant was a state prisoner there. He testified that for a period of fifty-nine days he was in what he called "the dungeon" in 1994. Sergeant Chalfant was an officer in that area of the prison and had daily contact with the Defendant.

59.     On cross-examination, the Defendant admitted that he knew his conditions of supervised release as he was instructed by his U.S. Probation Officer. He understood that part of those conditions of supervised release were to not frequent or be around places where controlled substances were used or present. Further, he was not to associate with persons who used or possessed controlled substances.

17

60.     The Defendant stated that he knew DiBartolo for approximately three to four months at most based upon the work he had performed at her father's home. They never went out before this incident and have never gone out since.

61.     The Defendant stated that he did not realize it was Sergeant Chalfant who was outside of the car shining the flashlight inside. He testified that the light was in his eyes and he could not see who was there. He saw Sergeant Chalfant walk up after they were out of the vehicle at the parking garage exit. He saw a badge hanging around Sergeant Chalfant's neck at that time. The Defendant stated that he saw Sergeant Chalfant pulling the badge out of his shirt as he was walking up at the location where the DiBartolo vehicle had been stopped by Officer Negrinelli.

62.     The first time he had seen the baggie with cocaine residue, Government's Exhibit 3, was at the Broward County Jail. The day after getting out of jail, he called DiBartolo at her house and told her he was charged with the cocaine, facing a federal violation of supervised release, and could go back to federal prison.

63.     The Defendant testified that DiBartolo called him a few times after that but he did not answer the phone because he was not to have any contact with her. This was apparently a condition of his bond which he must have violated by calling her immediately upon being released on bond from the Broward County Jail. Nevertheless, this is not a major issue in this Court's view.

64.     After the last hearing in this case on April 2, 2008, the Defendant stated that he called DiBartolo as his attorney directed him to do. He did not know at that time whether her case was finished in Broward County or not. DiBartolo purportedly told the

18

Defendant over the phone that she "was going to do the right thing" and he would not "take a fall for something he didn't do."

65.    The Defendant admitted that after testing positive for marijuana in respect to his November 5, 2007 urine specimen, U.S. Probation Officer Smith told the Defendant he was making poor choices by being around people who were using marijuana or controlled substances.  It was also pointed out at the hearing that the Defendant stayed at the concert even after smelling what he claimed to be a very strong odor of marijuana emanating from the entire audience.  The explanation given by the Defendant was that he had paid his money for the concert and did not want to leave.

66.    Counsel for the government attempted to make an issue of the fact that the Defendant did not have the ticket stubs which reflected the date of the "Rascal Flatts" concert to see if it had in any way corresponded with the date when he gave his urine specimen.  This Court does not find that to be an extremely important issue to this Court's decision.  This Court will accept the fact that the Defendant was at a concert and claims to be around "second-hand marijuana smoke."  However, this Court is not convinced that second-hand marijuana smoke caused the Defendant's urinalysis to test positive for the presence of marijuana since this Court has no testimony before it upon which to base such a finding.  The Defendant's own testimony in this regard is insufficient to overcome the laboratory analysis which reflects that there was more than a mere trace sample of marijuana in the Defendant's system.

## ANALYSIS

67.     The standard of proof in respect to evidentiary hearings such as this concerning possible revocation of supervised release is governed by Title 18, United States Code, Section 3583(e)(3). That statutory provision provides that after considering other statutory factors as set forth in § 3553, that the Court may revoke a term of supervised release if the Court finds by a preponderance of the evidence that the Defendant violated a condition of supervised release. The standard of proof was reiterated by the United States Supreme Court in Johnson v. United States, 529 U.S. 694 (2000), wherein the Court stated that violations of supervised release, though they may lead to reimprisonment, need not be criminal and need only be found by a judge under a preponderance of the evidence standard, not by a jury beyond a reasonable doubt. Therefore, this Court will review the evidence under a preponderance of the evidence standard in determining whether or not any of the three violations pending against this Defendant have been substantiated by the record in this case.

68.     In evaluating the testimony in this case, there are obvious inconsistencies between the facts depicted by the testimony of Sergeant Chalfant and Officer Negrinelli, as opposed to the testimony of Maria DiBartolo and the Defendant. This Court must make credibility determinations in respect to the totality of the facts presented in this case and the testimony of the specific witnesses. Credibility determinations are not based solely upon the status of the witnesses nor the professions they perform, in the case of police officers. Rather, credibility determinations are made by weighing the testimony of all the witnesses, taking into account the relative interests of the witnesses, the consistencies or inconsistencies in their testimony and their demeanor on the stand.

20

69.     This is a standard which this Court addressed and utilized at the trial level in the case of United States v. Ramirez-Chilel. The Eleventh Circuit Court of Appeals in United States v. Ramirez-Chilel, 289 F.3d 744 (11th Cir. 2002), approved such a standard for weighing the credibility of witnesses. This standard has been cited in subsequent decisions of the Eleventh Circuit as the appropriate standard for the trial court making credibility determinations when there are inconsistencies and conflicting testimony. United States v. Boulette, 2008 WL 450509 (11th Cir. 2008). In Boulette, the Eleventh Circuit Court of Appeals went even further and stated that credibility determinations are within the province of the finder of fact, or the trial court in this instance, because the finder of fact personally observes the testimony and is in a better position than a reviewing court to assess the credibility of witnesses. Further, the court went on to state, we must accept the evidence unless it is contrary to the laws of nature, or so inconsistent or improbable on its face that no reasonable factfinder could accept it. In using this as the appropriate standard of review, this Court will attempt to analyze the obvious inconsistencies of the testimony of the witnesses herein.

70.     This Court is going to address Violation Number 3 before addressing the other two violations since this Court believes that the evidence substantiating Violation Number 3 is clear and convincing. Violation Number 3 alleges that a urine sample submitted by the Defendant on November 5, 2007 was later analyzed and found to contain marijuana. The Defendant stipulated to the chain of custody of the urine specimen and the subsequent laboratory analysis which resulted in the finding that marijuana was present in the Defendant's urine specimen. This Court has no evidence before it that the laboratory analysis finding is consistent with the Defendant's explanation of being around

21

"second-hand marijuana smoke." The testimony before this Court from U.S. Probation Officer Smith was that trace amounts or small amounts of marijuana are not utilized by his office for the purpose of "violating" a person on supervised release. U.S. Probation Officer Smith testified that based upon the standards set by his office, such negligible findings in the laboratory analysis of an individual's urine specimen would not result in such a violation. Further, Government's Exhibit 1, which was entered into evidence by stipulation between the government and the Defendant, is the lab report which reflects a positive result for cannabinoids or marijuana. The lab report reflects that the analysis reflected a "positive or abnormal result" in respect to the presence of marijuana.

71.     This Court has no other evidence before it aside from the Defendant's explanation that there were numerous people smoking marijuana in a tightly packed outside concert. Further, if the Defendant was so concerned about this, he should have left the concert. However, his response to that question on cross-examination was that he had paid for his ticket and did not want to leave.

72.     This Court finds that the government has substantiated the fact that the Defendant possessed or used marijuana based upon the stipulated laboratory analysis which found the marijuana to be in his system. There is no evidence before this Court, expert or otherwise, that the marijuana could have been found in the Defendant's urine specimen other than by using such a controlled substance.

73.     In respect to Violation Numbers 1 and 2, the evidence on each of those violations is the same.   The evidence pertinent to those violations relates to the Defendant's purported possession of cocaine and/or being in the presence of Maria DiBartolo while she possessed cocaine. As stated by this Court at the conclusion of the

hearing in response to one of defense counsel's arguments, this Court does not accord any greater credibility to a police officer than it does any other witness who testifies in court. Credibility determinations are based solely upon weighing the testimony of the witnesses, taking into account the relative interests of each witness and the consistencies or inconsistencies in their testimony. This Court also takes into consideration the demeanor of the witnesses on the witness stand. Therefore, this Court is going to briefly review the testimony of Sergeant Chalfant, Officer Negrinelli, Maria DiBartolo and the Defendant on a level playing field and no greater weight will be given to the testimony of Chalfant or Negrinelli because of their occupation as police officers.

74.     Sergeant Chalfant testified that the Defendant and Maria DiBartolo drew his attention because they were "acting nervous" when they got off the elevator. Because of this, he watched them go to their vehicle where they sat with the vehicle running for approximately ten minutes. Finding this to be unusual, Sergeant Chalfant walked up to the vehicle from the passenger's side and shined his flashlight into the vehicle. By illuminating the inside of the vehicle, Sergeant Chalfant said that he was able to clearly see the Defendant using a credit card to cut up a white powdery substance on a CD in his lap. While in plain clothes, he claims to have had his badge out around his neck and was telling the occupants of the DiBartolo vehicle that he was a police officer. The vehicle then took off and was later stopped at the exit to the parking garage. This essentially ends the relevant testimony of Sergeant Chalfant as to what he observed the Defendant purportedly do.

75.     Officer Negrinelli then becomes involved with the stop of the DiBartolo vehicle at the exit to the parking garage. He then walked up to the passenger's side of the vehicle

23

and says he also observed the Defendant with a CD in his lap and the Defendant now attempting to brush a powdery substance onto the floor of the vehicle. Officer Negrinelli opens the passenger's side door, gets the Defendant out and secures him. Officer Negrinelli testified that the plastic baggie which was later found to contain cocaine was in the area where the Defendant was sitting in the passenger's seat. This cocaine baggie was found between the passenger's seat and the passenger door and not under the front seat. The CD which Officer Negrinelli observed the Defendant having in his lap and from which he was brushing powder onto the floor was also found on the passenger's side floorboard.

76.     This Court points out Officer Negrinelli did not observe the Defendant with a credit card, driver's license or any other such object as Sergeant Chalfant said he observed. There was no such object found in the vehicle. It is not for this Court to speculate or assume facts which are not in evidence. This Court is not going to speculate as to whether the object was tossed from the vehicle before arriving at the exit nor if it was missed during the subsequent search of the vehicle. The fact remains that no such object was found in the vehicle. This is an inconsistency between Officer Negrinelli's testimony and that of Sergeant Chalfant which this Court will address in summary fashion later herein.

77.     Maria DiBartolo was called for the purpose of taking responsibility for the cocaine. She testified that she bought it in Lake Worth for $20. However, she does not know who she bought it from nor where she bought it. Further, she did not know how much cocaine she actually bought for $20. She testified that she either used a key or the CD case to "snort" the cocaine earlier that day. She stated that the baggie that she

24

received when she bought the cocaine was under the front passenger's seat and not between the passenger's seat and the door. She further testified that other than her own attorney, she never told anybody about the cocaine. However, this appears to be somewhat inconsistent since this Court recalls her admitting to speaking on the phone with the Defendant shortly after he bonded out of the Broward County Jail on these cocaine charges. The Defendant's testimony was that he called her to tell her that he was a federal prisoner and could possibly go back to federal prison based upon this arrest. It was at that time that the Defendant testified that DiBartolo told him that "the cocaine was hers." The Defendant said that she told him that she was "going to do the right thing" and that he would "not take a fall for something he didn't do."

78.     Ms. DiBartolo also testified that she was never asked to testify for the Defendant, but agreed to do so even before her court case was dismissed in Broward County on or about February 18, 2008, as set forth in Defendant's Exhibit 1 in evidence at this hearing. This is a fact which this Court does not understand since Ms. DiBartolo also testified that she first met Mr. Smargon, the Defendant's attorney, at the last hearing this Court held in respect to this matter on April 2, 2008. She testified that it was at that time that she told Mr. Smargon what had happened. It was thereafter that the Defendant states that Mr. Smargon told the Defendant to contact Maria DiBartolo and have her come to court for the conclusion of the evidentiary hearing.

79.     Apparently, she told the Defendant back in September 2007 that the cocaine was hers. This Court is asked to believe now that even after the cocaine charges were dismissed against her in Broward County on or about February 18, 2008, that neither the Defendant nor his attorney contacted her to come forward to take responsibility for the

25

cocaine until April 2, 2008. These facts just do not match up in this Court's view. It makes it appear that Ms. DiBartolo is now taking responsibility for the cocaine only after the charges have been dropped against her in Broward County.

80.     Counsel for the Defendant argued and will continue to argue that the cocaine charges may be "reinstituted" by either the State authorities in Broward County or the United States Attorney's Office. However, in reality, the charges have been dismissed in state court and there very well may be a speedy trial issue where Ms. DiBartolo could not be prosecuted in state court on any crime arising out of the possession of cocaine. Whether or not the United States Attorney's Office would attempt to institute prosecution of Ms. DiBartolo based upon the extremely small amount of cocaine recovered in this case is highly questionable as well.

81.     This Court finds it incredible that Ms. DiBartolo purportedly told the Defendant back in September of 2007, after he bonded out of jail, that she was "going to the right thing" and not let him "take a fall for something he didn't do." Why was this not brought to the attention of the Defendant's attorney by the Defendant prior to April 2, 2008? If the Defendant had brought this to the attention of his attorney, Ms. DiBartolo's testimony would not be as it was before this Court. She specifically testified that she first met the Defendant's attorney at the April 2, 2008 hearing and "told him what happened."

82.     During his testimony, the Defendant vehemently denied possessing any cocaine and expressed his concern that a violation could send him back to federal prison, as he purportedly related to Ms. DiBartolo in his telephone conversation with her immediately after bonding out of jail. This Court certainly understands his apprehension in that regard. If he was aware that Ms. DiBartolo was willing to take responsibility for the

cocaine back in September 2007, this Court believes that he would have provided this information to his attorney well before April 2, 2008.

83.    The Defendant testified that he refused to answer calls when he saw that they were coming from Maria DiBartolo subsequent to his only telephone conference with her immediately after bonding out of jail. His explanation was that he was not to have any contact with her based upon the conditions of his bond. However, those are the same conditions of bond that were imposed upon him at the time that he purportedly made the first telephone call to Maria DiBartolo. Once again, these facts do not make sense either. This Court is led to believe that he did not consider it a violation of his bond to call her the first time, but subsequently refused to take any of her phone calls because it would be a violation of his bond. Yet she shows up at the beginning of the evidentiary hearing in this matter on April 2, 2008 and for the first time tells Mr. Smargon what happened. This Court is then led to believe that the Defendant had no contact with her until Mr. Smargon told him to contact her to testify at the continuation of the evidentiary hearing in this case.

84.    Maria DiBartolo claims responsibility for all of the cocaine and stated that she never observed the Defendant with any cocaine while in her vehicle. She admits that he had a CD case in his lap, but he was not in possession of any cocaine.

85.    The Defendant testified that he has never tested positive for narcotics before or after this incident with the exception of the positive urinalysis for marijuana in November 2007, which he challenges. The Defendant denies knowing that there was cocaine in the vehicle and denies the facts as related by the testimony of Sergeant Chalfant and Officer Negrinelli. The Defendant denies cutting cocaine with a credit card and denies brushing any white powder from the CD case as Officer Negrinelli testified he observed. The

27

Defendant testified that he considered Maria DiBartolo only an acquaintance based upon work that he had performed at her father's house. Out of the blue, Maria DiBartolo calls him and they go to the Hard Rock Casino for only an hour and a half.

86.    This Court has no evidence before it which would call into question the testimony of the Defendant concerning Maria DiBartolo only being an acquaintance or someone he met while doing work at her father's house. However, this Court finds it difficult to believe that after the Defendant purportedly talked with Maria DiBartolo on the phone after he bonded out of jail in September of 2007, that he would not in some manner bring to the attention of his attorney that Maria DiBartolo was willing to take responsibility for the cocaine. This Court understands that Ms. DiBartolo's case was still pending until February 18, 2008. However, a subpoena could have been served upon her or she could have been asked to testify prior to or subsequent to the final disposition of her case. This Court is led to believe that it is only on April 2, 2008 that Ms. DiBartolo is introduced to the Defendant's attorney and it is then for the first time that she tells Mr. Smargon about what happened. This Court finds this to be inconsistent with someone who is facing the possibility of going back to federal prison if a violation is substantiated concerning cocaine possession.

87.    This Court refers back to Ms. DiBartolo's testimony where she clearly stated that no one ever asked her to testify in this case, whether it be the Defendant, his attorney or anyone else. Based upon the severity of the offenses and the possible penalties that the Defendant was facing, this Court finds it incredible that no one, other than the Defendant, knew that she was going to take responsibility for the cocaine until April 2, 2008, which was over five weeks after her case was concluded in Broward County.

88.     In analyzing the testimony of all of these witnesses, this Court cannot find any logical reason why Chalfant and Negrinelli would be lying. This was not a large drug case or "drug bust." There was a negligible amount of cocaine retrieved in this case. This Court cannot envision why two individuals, whether they be police officers or not, would fabricate a story such as this about someone that they did not even know. True, Chalfant and the Defendant had met over fifteen years ago at the Martin County Correctional Institute when the Defendant was an inmate and Chalfant was a Department of Corrections officer. However, there is no evidence that there was any grudge or vendetta by Chalfant against this Defendant. In fact, the Defendant did not recognize Chalfant until he was at the Broward County Jail and Chalfant did not recognize the Defendant until he ran his record and recalled his name. Therefore, this Court cannot envision any logical reason why Chalfant and/or Negrinelli would fabricate what they saw. Their testimony is consistent with each other in that they both put the Defendant in possession of the CD case with a white powdery substance.

89.     This Court does not know what happened to the credit card or other object that Chalfant believed he thought the Defendant was utilizing. That is an inconsistency, but it is not enough for this Court to completely discount the other testimony of Chalfant and Negrinelli concerning what they observed under the preponderance of the evidence standard. The CD case and baggie are found on the passenger's side of the vehicle where the Defendant was sitting. The CD case and the baggie, which even Maria DiBartolo admits contained the cocaine at one time, were found to have trace amounts of cocaine based upon the laboratory analysis.

29

90.     It is obvious to this Court that there are inconsistencies and illogical explanations in the testimony of Maria DiBartolo.   This Court has addressed those previously herein and will not do so again here.   While Ms. DiBartolo may not have been the girlfriend of the Defendant, they were certainly friends.   Mere acquaintances do not call someone out of the blue and suggest that they go to a casino for an hour and a half.   Also, the Defendant knew how to contact Maria DiBartolo immediately upon his being bonded out of jail.   During that contact she purportedly told the Defendant that she was going to take responsibility for the cocaine.   Thereafter, it was not until April 2, 2008 that this was even brought to the attention of his attorney.

91.     This Court does not believe those set of facts and finds them to be completely inconsistent with the Defendant's vehement denials that he had any contact with cocaine in the DiBartolo vehicle in September 2007.   This Court finds Ms. DiBartolo's testimony to be inconsistent with the other evidence in the case as related by this Court above.   She is obviously a friend of the Defendant and that must be taken into consideration by this Court.   Her willingness to take responsibility for the cocaine comes after her charges have been dropped in Broward County concerning the possession of the cocaine.   Finally, her demeanor on the stand does not affect her credibility in this Court's view.   In fact, all of the witnesses, Chalfant, Negrinelli, DiBartolo and the Defendant, possessed normal demeanor.

92.     In respect to the Defendant's testimony, his relative interest in this case is obvious and need not be restated.   He faces the possibility of being sent back to prison after serving fourteen years and seven months on the underlying offense.   His testimony is inconsistent with that of Chalfant and Negrinelli as stated by this Court above.   Further,

30

this Court finds it incredible that he would not have brought to the attention of his attorney DiBartolo's willingness to take responsibility for the cocaine prior to April 2, 2008. It is clear from Ms. DiBartolo's testimony that she first came forward and told Mr. Smargon about "what happened" on April 2, 2008. This is conveniently subsequent to dismissal of the cocaine charges against her in Broward County.

93.    In reviewing this matter by the preponderance of the evidence standard as set forth in the statute and the applicable case law, this Court finds that the government has sustained its burden in establishing that the Defendant was in possession of cocaine on September 14, 2007 as set forth in Violation Number 1 and associating with Maria DiBartolo who jointly possessed the cocaine with the Defendant as set forth in Violation Number 2. Additionally, this Court finds that by the preponderance of the evidence standard, the Defendant and Maria DiBartolo knew that Chalfant was an officer and attempted to flee from him by leaving the parking garage area. This Court notes that after being stopped at the garage exit ramp, neither the Defendant nor Ms. DiBartolo got out and told the police officers there that some unknown man was up in the parking garage banging on their window. This would have been a normal reaction of a reasonable person if they truly did not believe that Chalfant, standing outside of their vehicle, was a police officer.

**ACCORDINGLY**, this Court recommends to the District Court that based upon the preponderance of the evidence standard, that this Court finds the Defendant to have violated his conditions of supervised release and specifically in respect to Violation Numbers 1, 2 and 3 set forth in the Superseding Petition, and that a sentencing hearing concerning his revocation be set by the District Court at its earliest convenience.

31

The parties shall have ten (10) days from the date of this Report and Recommendation within which to file objections, if any, with the Honorable James I. Cohn, United States District Judge assigned to this case.

**DONE AND SUBMITTED** this _____ day of April, 2008, at Fort Pierce, Northern Division of the Southern District of Florida.

FRANK J. LYNCH, JR.
UNITED STATES MAGISTRATE JUDGE

Copies furnished:
Hon. James I. Cohn
AUSA Carmen Lineberger
AFPD Samuel Smargon
U. S. Probation Office